## STRONG *v.* REPIDE.

### ERROR TO AND APPEAL FROM THE SUPREME COURT OF THE PHILIPPINE ISLANDS.

No. 110. Argued March 10, 11, 1909.—Decided May 3, 1909.

Although there is no technical finding of facts by the court of first instance of the Philippine Islands, if the opinion shows the facts on which the judgment is based and the courts below differ in regard thereto they may be reviewed by this court under § 10 of the act of July 1, 1902, c. 1369, 32 Stat. 691. *De la Rama* v. *De la Rama*, 201 U. S. 303.

Where a sale made through an agent of the vendor has been effected by the fraud and deceit of the vendee, the sale cannot stand whether or not the vendor's agent had power to sell.

A director upon whose action the value of the shares depends cannot avail of his knowledge of what his own action will be to acquire shares from those whom he intentionally keeps in ignorance of his expected action and the resulting value of the shares.

This is a rule of common law, and also of the Spanish law before the adoption of the Philippine Civil Code; and, under §§ 1261–1269 of that code, a contract obtained under such circumstances can be avoided by the party whose consent would not have been given had he known the facts within the knowledge of the other party.

Even though a director may not be under the obligation of a fiduciary nature to disclose to a shareholder his knowledge affecting the value of the shares, that duty may exist in special cases, and did exist upon the facts in this case.

In this case the facts clearly indicate that a director of a corporation owning friar lands in the Philippine Islands, and who controlled the action of the corporation, had so concealed his exclusive knowledge of the impending sale to the Government from a shareholder from whom he purchased, through an agent, shares in the corporation, that the concealment was in violation of his duty as a director to disclose such knowledge and amounted to deceit sufficient to avoid the sale; and, under such circumstances, it was immaterial whether the shareholder's agent did or did not have power to sell the stock.

While the method of payment cannot have induced the vendor's consent to a sale, where that method tended to conceal the identity of the purchaser and was part of a scheme to conceal facts, the knowledge of which would have resulted in vendor's refusal to sell, evidence as to the payment is admissible to show the fraudulent intent and scheme of the purchaser.

The expressed prohibitions in § 1459 of the Spanish Civil Code against directors of corporations acquiring shares of stock entrusted to them do not apply to purchases from others.

An expressed prohibition against directors acquiring shares held by themselves in a fiduciary capacity does not refer to purchases by directors of shares from others, or so limit the prohibitions against purchases of stock by directors that a sale to one cannot be avoided by his deceit in not disclosing material facts within his exclusive knowledge.

Although there may be objections to the form of judgment in the Court

of First Instance as they are not of a material nature this court will follow the same course.

6 Philippine, 680, reversed.

THIS action was commenced on the twelfth day of January, 1904, in the Court of First Instance of the city of Manila, Philippine Islands, by the plaintiffs in error, Eleanor Erica Strong and Richard P. Strong, her husband, against the defendant in error. It was brought by the plaintiff, Mrs. Strong, as the owner of eight hundred shares of the capital stock of the Philippine Sugar Estates Development Company, Limited, (the other plaintiff being added as her husband), to recover such shares from defendant (who was already the owner of 30,400 of the 42,030 shares issued by the company), on the ground that the shares had been sold and delivered by plaintiff's agent to the agent of defendant, without authority from plaintiff; and also on the ground that defendant fraudulently concealed from plaintiff's agent, one F. Stuart Jones, facts affecting the value of the stock so sold and delivered. The stock was of the par value of $100 per share, Mexican currency.

The plaintiff never had any negotiations for the sale of the stock herself; and was ignorant that it was sold until some time after the sale, the negotiations for which took place between an agent of the plaintiff and an agent of defendant, the name of the defendant being undisclosed.

In addition to his ownership of almost three-fourths of the shares of the stock of the company, the defendant was one of the five directors of the company, and was elected by the board the agent and administrator general of such company, "with exclusive intervention in the management" of its general business.

The defendant put in issue the lack of authority of the agent of the plaintiff, denied all fraud, and alleged that the purchase of the stock from plaintiff's agent (which stock was payable to bearer and transferable by delivery) was made by one Albert Kauffman, who afterwards sold and conveyed the same to the

defendant, and that the defendant, prior to the commencement of the suit and prior to any demand made upon him by the plaintiff in error herein, had sold, transferred and delivered the stock to Luis Gutierrez, a citizen and resident of Spain. (He was a brother of the defendant.)

In April, 1904, the case came on for trial in the Court of First Instance, which, on the twenty-ninth of that month, duly decided it and stated certain facts in the cause upon which it based its opinion and judgment, among which were the facts that the agent of the plaintiff had no authority to sell or transfer the shares of stock in question, and also that the transaction resulting in the delivery of the stock to the agent of the defendant was fraudulent, because the defendant concealed from the plaintiff's agent facts affecting the value of the stock, which the defendant was in good faith bound to reveal, by reason of which the sale of the stock to defendant was made for the total sum of $16,000, Mexican currency, while within two months and a half the shares were worth $76,256, United States currency. Upon the findings the court directed that the plaintiff recover from the defendant the sum found to be due by the court, which (after deducting the $16,000, Mexican currency) amounted to $138,352.71, Philippine currency, and the costs of suit, and it was ordered that the judgment might be satisfied by the delivery to the plaintiff, Mrs. Strong, of her eight hundred shares of stock within the time mentioned in the decree, in which event the plaintiff was to pay the defendant $16,000, Mexican currency, or its equivalent in Philippine currency. Other particulars were stated in the decree.

On May 3, 1904, a motion was made by defendant for a new trial, which, on May 9, 1904, was overruled.

A bill of exceptions was then made and appeal filed. Subsequently, and on January 18, 1906, the same was duly argued in the Supreme Court of the Philippine Islands, and on April 28, 1906, a decision was rendered by the court, holding that the agent of the plaintiff had no power to sell or deliver her stock, and it affirmed the decree of the Court of First Instance

on that ground, but not on the second ground taken by that court, that the sale of the stock through the plaintiff's agent had been procured by fraud on the part of the defendant.

Subsequently to the affirmance of the judgment the defendant, through his counsel, made a motion for a new trial on the ground of newly-discovered evidence, which consisted of a power of attorney (that had been mislaid and after the trial had been found) from Mrs. Strong to Mr. F. Stuart Jones and Mr. Robert H. Wood, which authorized both, or either of them, to sell or otherwise dispose of the property of the plaintiff as they or he might choose. After opposition this motion was granted and leave given to the parties to submit new evidence as to the nature of the authority delegated by the plaintiff in error to her agent Jones, and under that permission the newly-discovered power of attorney was put in evidence. Upon that piece of evidence the court held that the authority of the agent Jones was sufficient and that the paper became absolutely decisive of the issues in the case, and the order affirming the judgment of the court below was therefore set aside, the judgment of the Court of First Instance reversed and the action dismissed upon its merits. From that decree of reversal and dismissal the plaintiffs seek to bring the case here for review, and have sued out a writ of error and taken an appeal.

The facts out of which the controversy arises are in substance these:

In 1902 it was thought important for the Government of the United States to secure title, if reasonably possible, to what were called the friar lands in the Philippine Islands. To that end various inquiries were made on the part of the Government from time to time as to the possibility of obtaining title to all those lands and what would be the probable expense. The lands were not owned by the same people, but were divided among different and separate owners. The Philippine Sugar Estates Development Company, Limited, owned of these lands what are more particularly described as the Dominican lands,

and they were regarded as nearly one-half the value of all the friar lands.

On July 5, 1903, the governor of the Philippine Islands, on behalf of the Philippine Government, made an offer of purchase for the total sum of $6,043,219.47 in gold for all the friar lands, though owned by different owners. This offer, so far as concerned that portion of the lands owned by defendant's company, was rejected by defendant in his capacity as majority shareholder, without any consultation with the other shareholders. The representatives of all the different owners of all the lands, including defendant's company, in answer to the above offer, then fixed their selling price at $13,700,000 for all of such lands. During the negotiations consequent upon these different offers, which lasted for some time after the first offer was made, an offer was finally, and towards the end of October, 1903, made by the governor of $7,535,000. All the owners of all these friar lands, with the exception of the defendant who represented his company, were willing and anxious to accept this offer and to convey the lands to the Government at that price. He alone held out for a better offer while all the other owners were endeavoring to persuade him to accept the offer of the Government. The defendant continued his refusal to accept until the other owners consented to pay to his company $335,000 of the purchase price for their land and until the Government consented that a thousand hectares should be excluded from the sale to it of the land of defendant's company. This being agreed to the contract for the sale was finally signed by the defendant as attorney in fact for his company, December 21, 1903. The defendant, of course, as the negotiations progressed knew that the decision of the question lay with him, and that if he should decide to accept the last offer of the Government his decision would be the decision of his company, as he owned three-fourths of its shares, and the negotiations would then go through as all the owners of the balance of the land desired it. If the sale should not be consummated and things should remain as they were, the defendant also knew that the

value of the lands and of the shares in the company would be almost nothing. He himself says, in speaking of these lands owned by his company, that had the Government "given the haciendas the protection which they ought to have received they would have been worth $6,000,000 gold; but, considering the abnormal condition in which they were on account of the failure of the Government to protect these haciendas, it is impossible to fix any value; they were worth nothing; they were a charge." Also, the company had paid no dividends, and only lived on its credit, and could not even pay taxes. The company had no other property of any substantial value than these lands. They were its one valuable asset.

While this state of things existed, and before the final offer had been made by the governor, the defendant, although still holding out for a higher price for the lands, took steps, about the middle or latter part of September, 1903, to purchase the 800 shares of stock in his company owned by Mrs. Strong, which he knew were in the possession of F. Stuart Jones, as her agent. The defendant, having decided to obtain these shares, instead of seeing Jones, who had an office next door, employed one Kauffman, a connection of his by marriage; and Kauffman employed a Mr. Sloan, a broker, who had an office some distance away, to purchase the stock for him, and told Sloan that the stock was for a member of his wife's family. Sloan communicated with the husband of Mrs. Strong and asked if she desired to sell her stock. The husband referred him to Mr. Jones for consultation, who had the stock in his possession. Sloan did not know who wanted to buy the shares, nor did Jones when he was spoken to. Jones would not have sold at the price he did had he known it was the defendant who was purchasing, because, as he said, it would show increased value, as the defendant would not be likely to purchase more stock unless the price was going up. As the articles of incorporation, by subdivision twenty, required a resolution of the general meeting of stockholders for the purpose of selling more than one hacienda, and as no such general meeting had been called at

the time of the sale of the stock, Mr. Jones might well have supposed there was no immediate prospect of a sale of the lands being made, while at the same time defendant had knowledge of the probabilities thereof, which he had acquired by his conduct of the negotiations for their sale, as agent of all the shareholders, and while acting specially for them and himself.

The result of the negotiations was that Jones, on or about October 10, 1903, assuming that he had the power, and without consulting Mrs. Strong, sold the 800 shares of stock for $16,000, Mexican currency, delivering the stock to Kauffman in Sloan's office, who paid for it with the check of Rueda Hermanos for $18,000, the surplus $2,000 being arranged for, and Kauffman being paid $1,800 by defendant for his services. The defendant thus obtained the 800 shares for about one-tenth of the amount they became worth by the sale of the lands between two and three months thereafter. In all the negotiations in regard to the purchase of the stock from Mrs. Strong, through her agent Jones, not one word of the facts affecting the value of this stock was made known to plaintiff's agent by defendant but, on the contrary, perfect silence was kept. The real state of the negotiations with the Government was not mentioned, nor was the fact stated that it rested chiefly with the defendant to complete the sale. The probable value of the shares in the very near future was thus unknown to any one but defendant, while the agent of the plaintiff had no knowledge or suspicion that defendant was the one seeking to purchase the shares. The agent sold because, as he testified, he wanted to invest the money in some kind of property that would pay dividends, and he was expecting nothing from this company, as negotiations for the sale of the lands had gone on so long, and there appeared no prospect of any sale being made, at any rate not for a very long time.

It is undeniable that during all this time the subject of the sale of the friar lands was frequently mooted and its probabilities publicly discussed in a general way. Such discussion was founded upon rumors and gossip as to the condition of the

negotiations. The public press referred to it not infrequently, but the actual state of the negotiations, the actual probabilities of the sale being consummated, and the particular position of power and influence which the defendant occupied in such negotiations, prior to the time of the purchase of plaintiff's stock, were not accurately known by plaintiff's agent or by anyone else outside those interested in the matter as negotiators.

*Mr. Henry E. Davis* for plaintiffs in error and appellants:

Upon all the evidence in the case, even including the power of attorney, the defendant was guilty of the fraud alleged. "Consent given by error, under violence, by intimidation, or deceit shall be void." Civil Code, Art. 1265. "There is deceit when by words or insidious machinations on the part of one of the contracting parties, the other is induced to execute a contract which, without them, he would not have made." Civil Code, Art. 1269. See also Manresa, vol. 8, p. 623. And as to the principles governing this case, *Oliver* v. *Oliver*, 118 Georgia, 362; *Stewart* v. *Harris*, 69 Kansas, 498; *Miner* v. *Belle Isle Co.*, 93 Michigan, 97; *Ervin* v. *Oregon &c. Co.*, 27 Fed. Rep. 625, 631; *Wheeler* v. *Abilene. &c. Co.*, 159 Fed. Rep. 391; *Sidell* v. *Mo. Pac. Ry.*, 78 Fed. Rep. 424; *Ritchie* v. *McMullen*, 79 Fed. Rep. 522; *Farmers' Loan & Trust Co.* v. *New York Co.*, 150 N. Y. 410; *Hunter* v. *Hunter*, 50 Missouri, 229; *Stone* v. *Moody*, 84 Pac. Rep. 617; 1 Bigelow on Fraud, pp. 231, 297, 312; Domat's Civil Law, vol. 1, p. 574, No. 1457; *Id.*, p. 584, No. 1490; *Id.*, p. 510, No. 1259; *Id.*, No. 1260; *Id.*, p. 511, No. 1262; Escriche, Fraude.

*Mr. George E. Hamilton*, with whom *Mr. John W. Yerkes*, *Mr. M. J. Colbert* and *Mr. John J. Hamilton* were on the brief, for defendant in error:

Under the facts of this case the decisions of the courts of several of the States, holding that a director and stockholder must disclose his intention to another stockholder before buying stock from him, have no application, even if that rule was the

correct rule under the authorities controlling the question in this country; but that rule is not supported by the current of American authority. *Hooker* v. *Midland Steel Co.*, 117 Ill. App. 441; *Haarstick* v. *Fox*, 9 Utah, 110.

While directors stand in a fiduciary relation to the corporation itself, they do not stand in that relation when dealing with other stockholders for the purchase or sale of stock. In the purchase and sale of stock between stockholders there must be some actual misrepresentation in order to constitute fraud. Mere silence is not sufficient. *Walsh* v. *Goulden*, 130 Michigan, 531. See also *Krumbhaar* v. *Griffiths*, 151 Pa. St. 223; *Bloom* v. *Loan Company*, 152 N. Y. 114; *O'Neil* v. *Ternes*, 32 Washington, 528.

A director of the corporation itself may buy and sell its stock like any other individual. He is entitled to the benefit of his facilities for information. No confidential relation exists between him and a stockholder, as to sales of the stock; and, so long as he remains silent and does not actively mislead the person with whom he deals, the transaction can not be set aside for fraud. See Cook on Corporations, 4th ed., 1898, § 320, p. 622; and Taylor on Corp., 5th ed., § 698; Beach on Corp., §§ 246, 614.

MR. JUSTICE PECKHAM, after making the foregoing statement, delivered the opinion of the court.

The Court of First Instance at Manila gave judgment in favor of the plaintiffs on two grounds discussed in the opinion, one ground being that the agent of plaintiff, by whom the sale was concluded, had no authority to make it, and hence the delivery of the stock by him to defendant's agent was illegal; the other ground was that the defendant had been guilty of fraud in concealing certain facts from the seller affecting the value of the stock at the time when its sale was concluded.

Upon appeal to the Supreme Court of the islands the judgment was affirmed by a divided court, upon the ground of the

lack of authority of the plaintiff's agent to make the sale, but not upon the ground of the alleged fraud on the part of the defendant. Two of the judges dissented, on the ground that there was authority to make the sale, although they agreed with the majority that there was no fraud.

One of the majority held not only that there was no authority to sell, but that there was fraud, and therefore only concurred in the result in affirming the judgment for the plaintiff.

When the motion for a new trial was subsequently granted on account of newly-discovered evidence the majority of the court, on the authority of the second power of attorney (which was the newly-discovered evidence then received), held that it was sufficient to authorize the plaintiff's agent to make the sale he did in her behalf, and as the majority held there was no fraud in the case, the judgment for plaintiff was reversed and the complaint was dismissed.

Mr. Justice Johnson dissented, and filed a dissenting opinion in favor of the affirmance of the judgment of the Court of First Instance on both the grounds taken by it.

We are now called upon to review the judgment of the Supreme Court dismissing the complaint of the plaintiff. If the purchase of the stock by the defendant was obtained by reason of his fraud or deceit, it is not material to inquire whether the agent of the plaintiff had power to sell the stock. If fraud or deceit existed, the sale cannot stand. We shall therefore determine the question whether or not there was evidence of such fraud or deceit as would avoid the sale.

Although there is no technical finding of facts by the Court of First Instance, yet in its opinion that court does state facts upon which it bases its judgment, and which may be referred to for the purpose of determining what the facts are. On appeal or writ of error from the judgment of the Supreme Court of the Philippine Islands the facts (when the courts below differ) will be reviewed by this court under the tenth section of the act of July 1, 1902, c. 1369, 32 Stat. 691. *De la Rama* v. *De la Rama,* 201 U. S. 303, 309.

A careful perusal of the evidence brings us to the conclusion that it was ample to sustain the judgment of the Court of First Instance, considered with reference to the law applicable to the Philippine Islands.

The Civil Code of that jurisdiction after providing by article 1261 for the requisites of a contract, among which is the "consent of the contracting parties," says in article 1265 as follows: "Consent given by error, under violence, by intimidation, or deceit, shall be void." Articles 1266 to 1268, inclusive, explain the meaning of the words as used in article 1265, and describe what may be error, under violence or by intimidation. It is then provided by article 1269 that "There is deceit when by words or insidious machinations on the part of one of the contracting parties the other is induced to execute a contract which without them he would not have made." The meaning of the words "insidious machinations" may be said to be a deceitful scheme or plot with an evil design, or, in other words, with a fraudulent purpose. Thus, the deceit which avoids the contract need not be by means of misrepresentations in words. It exists where the party who obtains the consent does so by means of concealing or omitting to state material facts, with intent to deceive, by reason of which omission or concealment the other party was induced to give a consent which he would not otherwise have given. Article 1269. This is the rule of the common law also, but in both cases it is based upon the proposition that, under all the circumstances of the case, it was the duty of the party who obtained the consent, acting in good faith, to have disclosed the facts which he concealed. *Stewart* v. *Wyoming Cattle Ranch Co.,* 128 U. S. 383, 388. This was the Spanish law before the adoption of the code. Partidas 5, Titulo 5, Ley 57; Partidas 7, Titulo 16, Ley 1. See also Scaevola, Codigo Civil, Articles 1269, 1270. In such cases concealment is equivalent to misrepresentation.

The question in this case, therefore, is whether, under the circumstances above set forth, it was the duty of the defendant, acting in good faith, to disclose to the agent of the plaintiff

the facts bearing upon or which might affect the value of the stock.

If it were conceded, for the purpose of the argument, that the ordinary relations between directors and shareholders in a business corporation are not of such a fiduciary nature as to make it the duty of a director to disclose to a shareholder the general knowledge which he may possess regarding the value of the shares of the company before he purchases any from a shareholder, yet there are cases where, by reason of the special facts, such duty exists.   The supreme courts of Kansas and of Georgia have held the relationship existed in the cases before those courts because of the special facts which took them out of the general rule, and that under those facts the director could not purchase from the shareholder his shares without informing him of the facts which affected their value. *Stewart* v. *Harris*, 69 Kansas, 498; *S. C.*, 77 Pac. Rep. 277; *Oliver* v. *Oliver*, 118 Georgia, 362; *S. C.*, 45 S. E. Rep. 232. The case before us is of the same general character. On the other hand, there is the case of *Board of Commissioners* v. *Reynolds*, 44 Indiana, 509–515, where it was held (after referring to cases) that no relationship of a fiduciary nature exists between a director and a shareholder in a business corporation. Other cases are cited to that effect by counsel for defendant in error. These cases involved only the bare relationship between director and shareholder. It is here sought to make defendant responsible for his actions, not alone and simply in his character as a director, but because, in consideration of all the existing circumstances above detailed, it became the duty of the defendant, acting in good faith, to state the facts before making the purchase. That the defendant was a director of the corporation is but one of the facts upon which the liability is asserted, the existence of all the others in addition making such a combination as rendered it the plain duty of the defendant to speak. He was not only a director, but he owned three-fourths of the shares of its stock, and was, at the time of the purchase of the stock, administrator general of the company, with large.

powers, and engaged in the negotiations which finally led to the sale of the company's lands (together with all the other friar lands) to the Government at a price which very greatly enhanced the value of the stock. He was the chief negotiator for the sale of all the lands, and was acting substantially as the agent of the shareholders of his company by reason of his ownership of the shares of stock in the corporation and by the acquiescence of all the other shareholders, and the negotiations were for the sale of the whole of the property of the company. By reason of such ownership and agency, and his participation as such owner and agent in the negotiations then going on, no one knew as well as he the exact condition of such negotiations. No one knew as well as he the probability of the sale of the lands to the Government. No one knew as well as he the probable price that might be obtained on such sale. The lands were the only valuable asset owned by the company. Under these circumstances and before the negotiations for the sale were completed the defendant employs an agent to purchase the stock, and conceals from the plaintiff's agent his own identity and his knowledge of the state of the negotiations and their probable result, with which he was familiar as the agent of the shareholders and much of which knowledge he obtained while acting as such agent and by reason thereof. The inference is inevitable that at this time he had concluded to press the negotiations for a sale of the lands to a successful conclusion, else why would he desire to purchase more shares which, if no sale went through, were, in his opinion, worthless, because of the failure of the Government to properly protect the lands in the hands of their then owners? The agent of the plaintiff was ignorant in regard to the state of the negotiations for the sale of the land, which negotiations and their probable result were a most material fact affecting the value of the shares of stock of the company, and he would not have sold them at the price he did had he known the actual state of the negotiations as to the lands and that it was the defendant who was seeking to purchase the stock. Concealing his identity when

procuring the purchase of the stock, by his agent, was in itself strong evidence of fraud on the part of the defendant. Why did he not ask Jones, who occupied an adjoining office, if he would sell? But by concealing his identity he could by such means the more easily avoid any questions relative to the negotiations for the sale of the lands and their probable result, and could also avoid any actual misrepresentations on that subject, which he evidently thought were necessary in his case to constitute a fraud. He kept up the concealment as long as he could, by giving the check of a third person for the purchase money. Evidence that he did so was objected to on the ground that it could not possibly even tend to prove that the prior consent to sell had been procured by the subsequent check given in payment. That was not its purpose. Of course, the giving of the check could not have induced the prior consent, but it was proper evidence as tending to show that the concealment of identity was not a mere inadvertent omission, an omission without any fraudulent or deceitful intent, but was a studied and intentional omission to be characterized as part of the deceitful machinations to obtain the purchase without giving any information whatever as to the state and probable result of the negotiations, to the vendor of the stock, and to in that way obtain the same at a lower price. After the purchase of the stock he continued his negotiations for the sale of the lands, and finally, he says, as administrator general of the company, under the special authority of the shareholders, and as attorney in fact he entered into the contract of sale December 21, 1903. The whole transaction gives conclusive evidence of the overwhelming influence defendant had in the course of the negotiations as owner of a majority of the stock and as agent for the other owners, and it is clear that the final consummation was in his hands at all times. If under all these facts he purchased the stock from the plaintiff, the law would indeed be impotent if the sale could not be set aside or the defendant cast in damages for his fraud.

The Supreme Court of the islands, in holding that there was

no fraud in the purchase, said that the responsibility of the directors of a corporation to the individual stockholders did not extend beyond the corporate property actually under the control of the directors; that they did not owe any duty to the members in respect to their individual stock, which would prevent them from purchasing the same in the usual manner. While this may in general be true, we think it is not an accurate statement of the case, regard being had to the facts above mentioned.

It is said that by the code of commerce of the Philippine Islands the directors are declared to be mandatories of the society, and that by article 1459 of the Spanish Civil Code they are prohibited from acquiring by purchase, even at public or judicial auction, the property the administration or sale of which may have been entrusted to them, and that this is the extent of the prohibition. This provision has no reference to the purchase for himself, under such facts as existed here, by an officer of a corporation, of stock in the corporation owned by another. The case before us seems a plain one for holding that, under the circumstances detailed, there was a legal obligation on the part of the defendant to make these disclosures.

It is further objected, however, that the plaintiff, Mrs. Strong, denied that she had ever authorized her agent to sell this stock, and therefore by her own evidence there had never been any consent by her, obtained by fraud or otherwise, because there had never been any consent at all. There is nothing in this objection. Mrs. Strong contended that such authority as she had given never authorized her agent to sell this stock. That had nothing to do with the obligation of the defendant to make the disclosure of the facts already adverted to before the purchase of the stock from plaintiff's agent, and if, by reason of such failure, the defendant was guilty of a fraud in procuring the purchase from the plaintiff's agent it was a fraud, for which he became liable to the plaintiff, even though the plaintiff maintained that her agent was not authorized to sell. The court held that he was authorized, and therefore if he sold by

DEL. & HUD. CO. *v.* ALBANY & SUSQUEHANNA. 435

213 U. S.                              Syllabus.

reason of the fraud committed by defendant the plaintiff was thereby injured and the defendant became liable. In legal effect her consent was obtained by the fraud.

We have not overlooked the objections made in regard to the form of the judgment in the Court of First Instance, but are of opinion that such objections are not of a material nature, and we are disposed to follow the course pursued by that court in this case.

Other objections made by the defendant's counsel we have examined, but do not regard them as important. We therefore reverse the judgment of the Supreme Court, dismissing the complaint, and affirm that of the Court of First Instance, and

*It is so ordered.*