**Alfred W. MINISH and Margaret F. Minish, Plaintiffs-Appellants,**

v.

**J. Lassing HUEY et al., Defendants-Appellees.**

**No. 72–1937.**

United States Court of Appeals, Sixth Circuit.

Argued Feb. 5, 1973.

Decided July 31, 1973.

1. We observe, however, that several states have permitted such questions. *See* VII Wigmore on Evidence, § 1944 (3rd ed. 1940).

John G. Wright, Warsaw, Ky., for plaintiffs-appellants.

Moss Noble, Asst. U. S. Atty., for defendants-appellees; Eugene E. Siler, Jr., U. S. Atty., on brief.

Before WEICK, McCREE and KENT,* Circuit Judges.

WEICK, Circuit Judge.

Plaintiffs instituted action in the District Court under 7 U.S.C. § 1366 (1964) to review the determination made by the Market Quota Review Committee for Carroll County, Kentucky, that the plaintiffs' tobacco acreage allotment derived from three separate farms should be reduced in the year 1970 and retroactively to the year 1964, inclusive. The District Court affirmed without opinion the decision of the Review Committee on both the facts and the law, and the plaintiffs appealed to this Court.

We affirm in part, reverse in part, and remand for further proceedings.

This case arose under the Agricultural Adjustment Act, Subparts B and C, Tobacco Marketing Quotas and Administrative Provisions. 7 U.S.C. §§ 1311 to 1315, 7 U.S.C. § 1361 et seq. (1964). It resulted from the attempts by Mr. and Mrs. Minish to increase their initial tobacco acreage allotment for their 117-acre Kentucky farm.

In 1938 Congress enacted legislation designed to restrict artificially the supply of tobacco on the nationwide market in order to prevent "the result that abnormally excessive supplies [of tobacco] are produced and dumped indiscriminately on the Nation-wide market." 7 U. S.C. § 1311 (1964). The Secretary of Agriculture was empowered to assign tobacco acreage allotments to qualifying farms, i. e., qualifying farms were permitted to use a specified amount of their land to grow tobacco. The Act further provides:

"*Transfer of farm marketing quotas.* (d) Farm marketing quotas may

* The Honorable W. Wallace Kent died on May 28, 1973, subsequent to the oral argument of this appeal, and did not participate in the decision.

be transferred only in such manner and subject to such conditions as the Secretary [of Agriculture] may prescribe by regulations." 7 U.S.C. § 1313(d) (1964).

In 7 C.F.R. §§ 719.3 and 719.4, the Secretary has established inferentially two requirements relevant to the transfer of marketing quotas from one person to another: First, the transferee must become the *owner* of the land to which the allotment initially attached; and Second, the transferee must operate the total amount of owned land on which there is an allotment, *as a single farming unit*. In other words, a tobacco allotment cannot itself be sold by one farmer to another. There must also be a transfer of "ownership" of the land, and the combined farm must be operated as a unit. These determinations are made by a County Committee of local farmers. 7 C.F.R. § 719.2(2).

If a County Committee determines at any time that there has been an improper acreage allotment given to a farmer, it may "reconstitute" the allotment; it may increase, decrease, or reassign allotments, as the case may require. Such a reconstitution is effective only for the year in which that action was taken. 7 C.F.R. § 719.7(b)(1) provides:

"*Allotment crops.* The reconstitution shall be effective for an allotment crop for the current program year if such reconstitution is completed before such crop is planted . . . ."

However, there is an important exception to this section. 7 C.F.R. § 719.-7(b)(5) provides:

"*Misrepresentation.* Notwithstanding any other provision of this section, if the county committee determines that the farm was [initially] reconstituted because of a misrepresentation by a producer, the farm shall be properly reconstituted, and the effective date of such reconstitution for all purposes shall be retroactive to the date the farm was improperly reconstituted."

The effective date of 7 C.F.R. § 719.-7(b)(5) was October 20, 1967.

Mr. and Mrs. Minish have for some time owned a 117-acre farm located along the Kentucky River, in Carroll County, Kentucky. Early in 1964, the farm, which was identified in accordance with 7 C.F.R. § 719.2(k) by the serial number C–306, had an allotment or quota for growing Burley tobacco of 4.-21 acres. During that year the Minishes commenced a series of three transactions designed to increase the amount of tobacco that they could grow.

On March 16, 1964 the Minishes entered into an arrangement with a Mrs. Bess Boulton, owner of a small farm which had a tobacco allotment of .61 acres, whereby Mrs. Boulton conveyed the title to the farm to the Minishes by deed. The deed recited that the consideration therefor was one dollar and other (unspecified) good and valuable consideration. The deed was duly recorded on March 17, 1964. Also on March 16, 1964, the Minishes leased back to Mrs. Boulton (for an undisclosed consideration) the entire farm for all purposes except agricultural (which farm had on the same day been deeded to the Minishes).

The lease to Mrs. Boulton contained an option to repurchase the land at the expiration of the term of the lease, in six years. On the same day, March 16, 1964, Mrs. Boulton exercised her option to repurchase her farm by payment to the Minishes of one dollar and delivery to them of a copy of the local newspaper, as specified in the option. The repurchase was to be effective at the expiration of the lease. The lease was notarized on March 16, 1964, and was duly recorded on March 17, 1964.

Having obtained the deed to the Boulton tract, Mr. Minish applied to the County Committee to have his original farm reconstituted on March 26, 1964. Action was taken by the County Committee and the Boulton farm (G–808) was combined with the Minish farm (C–306) for purposes of tobacco allot-

ment. This combination increased the Minish allotment to a total of 4.82 acres (4.21 + .61 = 4.82 acres) for the year 1964.

On November 30, 1964, Mr. and Mrs. Minish entered into a similar arrangement with Edward and Clara Westrick, the owners of a 102-acre farm with a Burley tobacco allotment of 1.23 acres. A deed conveying the Westrick property was transferred to the Minishes for one dollar and other (unspecified) good and valuable consideration. The Minishes then executed to the Westricks a lease for all purposes except agricultural, for a term of six years, with an option in the Westricks to repurchase the tract at the end of the term, provided they give proper notice and provided they pay one dollar and deliver to Minishes a copy of the local newspaper. The Minishes immediately, *i. e.*, on November 30, 1964, gave to the Westricks a written waiver of the notice-provisions in the lease. The deed and the lease agreement were duly recorded.

Again, the Minishes went to the County Committee to have the farm reconstituted for purposes of their tobacco allotment. Action was taken by the Committee and the tobacco allotment to the Minishes was increased by 1.23 acres.

In 1966 the Minishes entered into a different type of arrangement to increase their tobacco acreage allotment. They leased from one, Othur Stewart, a small 2-acre farm which had a tobacco allotment of .47 acre. The Minishes did not record this lease, but they did exhibit it to the County Committee in requesting that the .47 acre allotment be reconstituted to their farm. The County Committee reconstituted the Minish farm with the .47 acre from Othur

Stewart, in 1966 and thereafter, as the lease was renewed by the parties.

Thus, between 1964 and 1966 the Minishes increased substantially their Burley tobacco allotment by means of these three transactions.

On August 12, 1968, pursuant to the option to purchase in the lease-back agreement, the Minishes conveyed farm G–808 back to Mrs. Boulton. Because they had grown no crops on the G–808 tract under the 1964 agreement, all of the tobacco having been grown on the original Minish tract (C–306), the Minishes persuaded the County Committee to reconstitute the tobacco allotment to the combined C–306 and G–808 farm solely to the "parent farm" (C–306, the Minish farm). The plaintiffs explain in their brief to this Court the basis for such action:

> "The regulation now provides for a division of the tobacco base upon a history/contribution method. Yet, prior to that date the regulation provided for a division of the tobacco base on a cropland basis, and further that the identity as cropland was lost if a row-crop was not produced on the land within the five years immediately preceding the reconstitution. Hence, if a parcel with a base was obtained, by legal title, and then combined with another owned tract, and the acquired tract was not applied to row-crops for five crop-years, it lost its identity as cropland, and then legal title could be divested without the required division of the tobacco base, as combined."[1]

On May 23, 1969 the Carroll County Committee, in obedience to the written instructions of the State Executive Director of the State Agricultural Stabilization and Conservation Committee,[2]

---

1. Since September, 1964, the regulations have actually provided for a division based upon a history-contribution method, that is, a method where the allotment to divided parcels is determined by the amount of tobacco that was grown on each parcel when they were combined. Thus, in 1968 when the Boulton tract was conveyed back to Mrs. Boulton, the cropland method was entirely inapplicable.

2. The plaintiffs allege as error the participation of the State Executive Director in the County proceedings. They argue that he unfairly influenced the decision-making process at the lower level. How-

reconstituted farm C–306 and divided the allotments as follows: farm C–306, A. W. Minish, owner and operator; farm G–808, Bess Boulton, owner and operator; and farm A–77, Othur Stewart, owner and operator.

After additional proceedings not relevant here, the County Committee informed the plaintiffs that not only was their allotment for 1970 reduced, but also that they had overproduced tobacco for the years 1964 to 1970. The Committee informed the plaintiffs that they were being assessed penalties for all overproduction.

The plaintiffs appealed this determination to the Review Committee. The Review Committee, after a hearing at which testimony and documentary evidence were presented, upheld the assessment by the County Committee of retroactive penalties. In so doing, the Review Committee specifically found the following:

1. "When the Carroll County ASC Committee approved Mr. Minish's application, they acted solely on Mr. Minish's statement that he had purchased Mrs. Boulton's farm. They did not know that he had leased that farm to Mrs. Boulton or that she had option to repurchase it, or that he had received further consideration to exercise that option or that he had waived notice of its exercise."

2. "When the Carroll ASC County Committee approved Mr. Minish's application, they acted solely on his oral and written statement on his application that he had purchased the Westrick farm. The Committee was ignorant of the lease of that farm from Mr. and Mrs. Minish to Mr. and Mrs. Westrick."

3. "The transactions between Mr. and Mrs. Minish with Mrs. Boulton and Mr. and Mrs. Edward Westrick, Jr., with respect to farms G–808 and

A–77, had the legal effect of transferring the Burley tobacco acreage allotment for those farms to farm C–306, A. W. Minish, owner and operator, without transferring ownership of farms G–808 and A–77 to Mr. and Mrs. Minish."

4. "Farms G–808, A–77 and C–914 were never operated as a single farming unit by Alfred W. Minish. The farm labor and machinery are not readily interchangeable during the period when normal farming operations are in progress. The crop pattern and land uses do not reflect a single farming unit."

There are three significant issues presented in this appeal: First, were the plaintiffs the "owners" of the Boulton and Westrick farms within the meaning of the Act? Second, if the plaintiffs were not the owners of the Boulton and Westrick farms, did the plaintiffs misrepresent their legal status to the County Committee, which misrepresentation would justify the assessment of retroactive penalties for improper allotments on these two farms? Third, did the plaintiffs misrepresent either their legal status relative to the Stewart farm or the fact that they did not operate it as "a single farming unit" with the original (C–306) farm, which misrepresentation would justify the Committee's assessment of retroactive penalties for overproduction of allotment on the Stewart farm?

## OWNERSHIP OF THE BOULTON AND WESTRICK FARMS

As heretofore noted, ownership is an element used in the determination of tobacco allotments to any farmer. 7 C.F.R. §§ 719.3 and 719.4. The regulation defines "owner" as follows:

"*Owner*. Person who has legal ownership of farmland." (7 C.F.R. § 719.2(p)).

---

ever, in light of the fact that participation of the State Committee is specifically authorized under 7 C.F.R. § 719.13, and in recognition of its greater expertise,

(the County and Review Committees are composed of locally elected farmers), we cannot accept this participation as error.

It could be argued that the proper interpretation of the definition of owner is legal as opposed to equitable ownership; that under the expansive doctrine of legal ownership in Kentucky, the plaintiffs, by virtue of simple deeds to the Boulton and Westrick farms, were the "legal" owners of those farms; see Marinaro v. Deskins, 344 S.W.2d 817, 819 (Ky.1961); Chalk v. Chalk, 291 Ky. 702, 165 S.W.2d 534 (1942); Scroggins v. Nave, 133 Ky. 793, 119 S.W. 158, 159 (1909). Accordingly, it could be contended that in this case the plaintiffs *technically* come within the terms of the regulations because of their artful paperwork, and that the courts are constrained to give them the benefits which they sought.

The web of paperwork that the plaintiffs have spun for the courts is intricate; however, the escape is simple. The plaintiffs' actions fall within the well-established doctrine that the courts may disregard sham legal contrivances.

In Particelli v. Commissioner of Internal Revenue, 212 F.2d 498, 500 (9th Cir. 1954), the Court stated:

> "It is recognized that a taxpayer is free to employ any legal means in the conduct of his business affairs to avoid or minimize taxes, but the means employed must not be mere subterfuge or sham. Commissioner of Internal Revenue v. Tower, 1946, 327 U.S. 280, 66 S.Ct. 532. 90 L.Ed. 670; Nordling v. Commissioner of Internal Revenue, 9 Cir., 1948, 166 F.2d 703, certiorari denied 335 U.S. 817, 69 S. Ct. 38, 93 L.Ed. 372."

*Accord,* Redwing Carriers, Inc. v. Tomlinson, 399 F.2d 652 (5th Cir. 1968).

The "sham" doctrine is applied also to corporations which attempt to achieve certain benefits by artful paper contrivances relative to themselves, their sub-sidiaries, or other corporations. *See e. g.,* Thoni Trucking Co. v. Foster, 243 F. 2d 570 (6th Cir. 1957); Cooper v. Vitraco, 320 F.Supp. 239 (D.Virgin Islands, 1970). The doctrine has been applied even to marriages by aliens attempting to enter the United States as nonquota immigrants. Rocha v. United States, 288 F.2d 545 (9th Cir. 1961).

We have no difficulty in applying the sham doctrine to the present case. Plaintiffs had deeds showing "ownership" of the Boulton and Westrick farms. Yet, with the lease-back agreements, the options to repurchase which were immediately exercised, and the notices of repurchase which were immediately waived, the plaintiffs' ownership amounted to nothing more than the intended transfer of tobacco allotments. The substance of the transactions was sham ownership, which is no ownership at all. Furthermore, the Minishes never carried on any farming operations on the Boulton, Westrick or Stewart farms. They just used the allotments for these farms, growing the tobacco on their own farm.

### MISREPRESENTATION: BOULTON AND WESTRICK FARMS

Because the plaintiffs were assessed excess quota penalties retroactively to 1964, it is necessary to determine whether substantial evidence on the record supports the implicit determination[3] that plaintiffs misrepresented the nature of the Minish-Boulton and Minish-Westrick transactions in applying for reconstitution of the tobacco allotments. Jones v. Hughes, 400 F.2d 585, 590 (8th Cir. 1968).

Initially, it should be noted that in order to find misrepresentation, it is not necessary that an affirmative falsehood be shown. Misrepresentation in-

---

3. The Review Committee did not, in its findings of fact or conclusions of law, explicitly use the word "misrepresentation"; however, the finding of misrepresentation is implicit in the ultimate determination that excess quota penalties were to be assessed retroactively.

Moreover, in a letter dated April 24, 1970, directed to Mr. Minish, the County Committee stated that the penalties were being assessed retroactively because of a "misrepresentation" to that Committee.

cludes the intentional omission of a material fact.

In Dennis v. Thomson, 240 Ky. 727, 739, 43 S.W.2d 18, 23 (1931), the Court stated:

"A false impression may consist in a concealment of what is true as well as an assertion of what is false. Faris v. Lewis, 2 B.Mon. 375; Singleton's Adm'r v. Kennedy & Co., 9 B.Mon. 222; Crescent Grocery Co. v. Vick, supra [194 Ky. 727, 240 S.W. 388]; Weikel v. Sterns, 142 Ky. 513, 134 S.W. 908, 34 L.R.A.(N.S.) 1035; Eversole v. Chandler, 217 Ky. 148, 289 S.W. 215. The suppression of truth is as vicious and disasterous as a false representation. The motive is the same in either case, and the result should be the same, since it is the intention that constitutes the fraud. Ruffner v. Ridley, 81 Ky. 165; Hays v. Meyers, 139 Ky. [440], 444, 107 S.W. 287, 32 Ky.Law Rep. 832, 17 L.R.A.(N.S.) 284, 139 Am.St.Rep. 493; Taylor v. Bradshaw, 6 T.B.Mon. 145, 17 Am.Dec. 132."

In Strong v. Repide, 213 U.S. 419, 430, 29 S.Ct. 521, 524, 53 L.Ed. 853 (1909), the Court described this common law principle as follows:

"Thus, the deceit which avoids the contract need not be by means of misrepresentations in words. It exists where the party who obtains the consent does so by means of concealing or omitting to state material facts . . . ."

See generally, 37 Am.Jur.2d 196, Fraud and Deceit, Sec. 144.

The Review Committee specifically found that Mr. Minish represented to the County Committee that he was the owner of the Boulton and Westrick farms, omitting to inform them of the underlying lease-back agreements, options to repurchase, etc. This omission was certainly material.

The only attack that the plaintiffs make upon this finding is an assertion that Mr. Minish "talked with" a Mrs. Millie Bond in the office of the County Committee, about the whole transaction, prior to the execution of the various documents. This assertion hardly warrants reversing the findings of the Review Committee.

First, Mrs. Millie Bond was not a member of the County Committee, nor was she authorized to bind it or waive its requirements. She was a "Program Assistant" in the County office. Second, the plaintiffs admit in their brief that Mrs. Bond testified that she did not remember talking with Mr. Minish about these particular transactions. The County Committee could make a credibility determination. Third, the actual members of the County Committee testified that they were unaware of the underlying transactions with Mrs. Boulton and the Westricks at the time of the reconstitutions.

■ Accordingly, the finding that the plaintiffs misrepresented facts to the County Committee, which misrepresentation justified the Committee's imposition of retroactive reconstitution of the plaintiffs' farm, is supported by substantial evidence, and we are required to uphold it.

However, the plaintiffs strenuously urge that even if they did misrepresent to the County Committee the nature of their "ownership" of the Boulton and Westrick farms, excess quota penalty assessments cannot be made retroactive prior to October 20, 1967, which was the effective date of the provision empowering retroactive reconstitutions. 7 C.F.R. § 719.7(b)(5). This argument is not persuasive.

■ Misrepresentation or fraud voids a transaction *ab initio*. Cf., Restatement, Contracts, § 475 (1932). No statutory authorization is required in order to retake that to which one was never entitled in the absence of the misrepresented fact. See Boesche v. Udall, 373 U.S. 472, 83 S.Ct. 1373, 10 L.Ed.2d 491 (1963), holding that the Secretary of the Interior could retroactively cancel oil leases for fraud, without specific statutory authorization.

In Neblett v. Macfarland, 92 U.S. 101, 103, 23 L.Ed. 471 (1875), the Court, in discussing the principle as it relates to the rescission of contracts, stated:

"The court proceeds on the principle, that, as the transaction ought never to have taken place, the parties are to be placed as far as possible in the situation in which they would have stood if there had never been any such transaction." (Quoted in Pan American Petroleum & Transp. Co. v. United States, 273 U.S. 456, 505, 47 S.Ct. 416, 424, 71 L.Ed. 734 (1927)).

■ We hold that it was permissible to reconstitute the plaintiffs' farm retroactively to 1964 because of the misrepresentation of Mr. Minish relative to the Boulton and Westrick transactions.

## MISREPRESENTATION: THE STEWART FARM

■ The County Committee not only imposed retroactive penalties for overproduction relative to the Boulton and Westrick tracts, but it also imposed such penalties for overproduction relative to the Stewart tract. We vacate and set aside this latter assessment. We can find no basis in the record for a determination that Mr. Minish misrepresented either the nature of the legal transaction or the nature of the farming operation with respect to the Stewart tract.

The Review Committee did not find that Mr. Minish misrepresented the nature of the legal arrangement that he had with Mr. Stewart, which was a simple leasehold. To the contrary, the Committee stated in its findings that Mr. Minish presented the lease from Mr. Stewart when he requested reconstitution for that tract.

The Review Committee did find that Mr. Minish failed to operate the different farms "as a single farming unit" as required by 7 C.F.R. § 719.3(d)(5). There is absolutely no evidence in the record, however, indicating that the County Committee was unaware of the manner in which Mr. Minish was operating the farms. Furthermore, since the County Committee was composed of local farmers (7 C.F.R. § 719.2(2)), at least one of whom lived near Mr. Minish, it is more than likely that the Committee members were at all times aware that "[t]he farm labor and machinery are not readily interchangeable during the period when normal farming operations are in progress," and that "[t]he crop pattern and land uses do not reflect a single farming unit," as found by the Review Committee.[4]

Finally, the regulations impose a specific duty on the County Committee to "satisfy itself that the operator will be in general control of the farming operations on the farm in the program year." 7 C.F.R. § 719.4(e).

In sum, we find no support in the record for the retroactive assessment of penalties with respect to the Stewart farm because there was no *misrepresentation* by the plaintiffs of either their legal or functional relationship with that farm.

We therefore affirm the judgment of the District Court insofar as it relates to the Boulton and Westrick farms, and we reverse with respect to the Stewart farm, and remand to the District Court for a recomputation of the penalties by excluding therefrom any penalty assessed with respect to the Stewart farm.

4. It is interesting to note that these "findings of fact" by the Review Committee merely parrot the language of 7 C.F.R. § 719.4(c), which defines a single farming unit as tracts of land where "(1) The farm labor and machinery are or could be freely interchanged during the period when normal farming operations are in progress; (2) the cropping pattern or land uses will be such as to reflect a single farming unit . . . ."