Lawrence R. BARNETT et al.,
Plaintiffs-Appellants,

v.

Don KIRSHNER et al.,
Defendants-Appellees.

No. 174, Docket 75–7284.

United States Court of Appeals,
Second Circuit.

Argued Nov. 28, 1975.

Decided Dec. 30, 1975.

1968 and loaned KEC $32,000. On December 30, 1968, the defendants, Herbert T. Moelis (Vice-President and Treasurer of KEC), Don Kirshner (President) and Irving Cohen (counsel to KEC) acquired from Barnett and Gordon all of their KEC stock at the agreed upon price of $14,000. The loans each had made to KEC were repaid with interest and any obligation to make further loans was assumed by the defendants. Hollender sold his shares on January 29, 1969 to Cohen as nominee for the ultimate purchaser. Hollender received $8,000 cash, was reimbursed for his $32,000 loan plus interest and was relieved of any obligation to make further loans to KEC. The agreed price was $1.00 per share in all of these sales.

Franklin B. Velie, New York City (Bergreen & Bergreen, Gordon, Hurwitz, Butowsky & Baker, New York City), for plaintiffs-appellants.

Barry I. Fredericks, New York City (Harris, Fredericks & Korobkin, Edward Marion, New York City, of counsel), for defendants-appellees.

Before LUMBARD, FRIENDLY and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

The plaintiffs below, Lawrence R. Barnett, C. Leonard Gordon and Alfred L. Hollender, acquired shares of stock in Kirshner Entertainment Corporation (this and its subsidiary and related companies are hereinafter referred to as KEC). All were executives of Chris Craft Industries and acquired their stock interests in KEC through Herbert J. Siegel, Chairman of the Board and President of Chris Craft. Barnett acquired 8,000 shares in June, 1967 at a cost of $1.00 a share with the additional obligation to lend the company $80,000 ($32,000 was in fact loaned). Gordon acquired 6,000 shares in June and September of 1967 at a cost of $1.00 a share with the obligation to lend KEC $40,000 and in fact loaned the company $24,000. Hollender purchased 8,000 shares in March,

On February 11, 1969 Kirshner and Moelis commenced negotiations on behalf of KEC to acquire the musical properties of Alan Jay Lerner, the well-known composer and lyricist and a legal client of Cohen. On March 13, 1969 the acquisition was finalized. KEC's stock was split five-for-one later in 1969 and in March, 1970 KEC made a public offering at $10 per share. Prior to the offering all shares were privately held and all the stockholders who are parties to this action were signatories to restrictive stockholders' agreements. The amended complaint in this action, brought in the United States District Court for the Southern District of New York, charged the defendants with conspiring to purchase the plaintiffs' holdings in KEC at a price substantially below their real value by wilfully concealing the proposed sale to KEC of the valuable property rights of Alan Jay Lerner, which substantially enhanced the value of the KEC stock. The first cause of action was based upon violations of section 10 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 of the General Rules and Regulations of the SEC, 17 C.F.R. § 240.10b–5. The second cause of action alleged the same facts to constitute a breach by the defendants of their fiduciary obligations to the plaintiffs.

The complaint sought rescission of the stock transactions, damages and injunctive relief.

The matter was tried before Hon. Whitman Knapp without a jury on December 18 and 19, 1974. In an opinion filed on April 9, 1975, Judge Knapp entered judgment on behalf of the defendants dismissing the complaint. This appeal followed.

I

In his opinion below, Judge Knapp found that the plaintiffs had sold their stock prior to February, 1969 and that this was before the defendants had in any way initiated, or made any plans to initiate, the Lerner transaction. Hence there could be no fraudulent concealment of the acquisition.

■ The plaintiffs' argument that the sale of the KEC stock in issue had not been consummated prior to February, 1969, is based upon the proposition that the restrictive KEC shareholders' agreement of June 26, 1967 (and successor agreements) granted the corporation and its individual shareholders a right to first refusal of the stock held by any of the shareholders including the three plaintiffs. In recognition of the fact that the contemplated sale to the defendants would breach the agreement, KEC's counsel prepared so-called consent letters which were executed by the selling plaintiffs at the same time as the documents of sale. The consent forms were addressed to KEC and each individual stockholder, including each plaintiff, who was a party to the KEC stockholder agreement. The pertinent sections of the consent letter relied upon are set forth in the margin.[1] The plaintiffs argue that under paragraph 5 of this agreement if the transactions contemplated therein were not consummated on or before March 1, 1969, the agreement became null and void by its terms. The court below found that not all the consents, described as waivers of the option rights, had been fully completed until sometime after the KEC–Lerner negotiations began in February, 1969. Appellants argue that the timely execution of the consent letters by all the other stockholders was a condition precedent to the sale of the plaintiffs' stock, and this condition not having been complied with, the sale had not been consummated and the obligation to disclose the Lerner transaction continued.

We cannot agree. The transactions contemplated by the consent letter were the waiver of the option privileges by the non-selling stockholders as well as the undertaking by the defendants to be bound by the stockholder agreements and to assume the loan obligations of the plaintiffs. The stock sales in question were separate transactions effected by delivery and payment for the shares and evidenced by documents which contain no reservations or conditions. What

---

1. Some thirty-five identical consent documents were admitted into evidence. The pertinent parts of one consent letter, Exhibit 19, are as follows:

2. To induce you to permit me to purchase all of the common stock of Entertainment, DKMI and of KEC owned by C. Leonard Gordon and to arrange to lend to Entertainment the sum of $24,000 on the same terms and conditions as the said loan by Gordon, I hereby agree, effective from the date on which such purchase shall be completed, to become and be bound by each of the Agreements as if I had been named therein at the time of their original execution. Effective from such date, each of you releases C. Leonard Gordon from any and all liability under the Agreements.

3. On such effective date, I shall execute and deliver to Entertainment a stockholder's consent to Entertainment's Subchapter S election and similarly with respect to DKMI and KEC.

4. Your consent to the transactions contemplated by this Agreement dated in December, 1968 (the "December 1968 Agreement"), shall, in relation to such transactions, constitute a waiver of the rights granted to you pursuant to Paragraph "2" of the Stockholders' Agreement identified in Paragraph "1(b)" of this December 1968 Agreement.

5. If the transactions contemplated by this December 1968 Agreement are not consummated on or prior to March 1, 1969, this December 1968 Agreement shall be null and void.

remedies, if any, a non-consenting stockholder might have (seemingly all consents were eventually obtained) against the plaintiffs or defendants is not in issue here.[2] As between plaintiffs and defendants legal title to the KEC shares passed on December 30, 1968 and January 29, 1969. Aside from the failure of the consent letter to provide that the sales were subject to any condition precedent,[3] the conduct of the parties would justify the finding below that "[t]he uncontradicted evidence at trial clearly indicates that the plaintiffs intended and did in fact sell their stock interests in KEC on the dates the shares were tendered. . . ." Thus the exhibits on trial acknowledge the sale of the securities and the discharge of the loan obligations, as well as the repayment of the loans already made with interest. No reservation or condition is expressed in any of the papers.[4] Barnett testified on trial that the sale of his stock was completed on December 30, 1968. Moreover, Gordon admitted that he saw no significance to the consent letter in respect to the sale. We cannot escape the conclusion reached below that there was a completed sale of the stock on the days the shares were transferred and that the consent letters were separate and apart from the sales between the parties, in no way conditioning expressly or by implication the passage of title to the defendants.

## II

The remaining issue on appeal is whether or not the defendants had sufficiently embarked upon their purchase of the Lerner properties on or before the dates of the stock sales, December 30, 1968 and January 29, 1969 to invoke Rule 10b–5. As the court below indicated, if the Lerner deal was afoot prior to the sales in question there would undoubtedly be Rule 10b–5 liability. The musical rights to the songs from My Fair Lady, Brigadoon, Camelot and Gigi, to mention some of the more memorable, were obviously valuable as the subsequent behavior of KEC stock demonstrated. On this issue the testimony of Cohen, who not only was counsel to KEC but had represented Lerner, is crucial since obviously his prior relationship with Lerner would suggest that his role in any such transaction would be prominent. Cohen testified, however, that the first time the possibility of a Lerner-KEC transaction crossed his mind was on February 2, 1969 when the defendant Moelis suggested over the telephone that Cohen arrange a meeting between Kirshner and Lerner. In the pre-trial order, the parties stipulated that this conversation took place in the manner in which Cohen testified it did. While the timing of this transaction might well give one pause, coming as it did on the heels of the sales in issue, Judge Knapp found

2. There is authority for the proposition that a non-consenting stockholder may have redress for breach of a restrictive agreement either by way of damages, *In re Argus Co.*, 138 N.Y. 557, 34 N.E. 388 (1893), or rescission, *Tomoser v. Kamphausen*, 307 N.Y. 797, 121 N.E.2d 622 (1954). In this case the plaintiffs not only consented but knowingly sold the stock in breach of the agreement as noted below.

3. This fact distinguishes the cases principally relied upon by appellant. *Detroit Football Co. v. Robinson*, 186 F.Supp. 933 (E.D.La.), aff'd, 283 F.2d 657 (5th Cir. 1960), involved a player's contract which contained a clause expressly conditioning its validity upon the approval of the N.F.L. Commissioner. *Pugh v. Fairmont Gold & Silver Mining Co.*, 112 U.S. 238, 5 S.Ct. 131, 28 L.Ed. 684 (1884); *Hicks v.*

*Bush*, 10 N.Y.2d 488, 225 N.Y.S.2d 34, 180 N.E.2d 425 (1962) and *Smith v. Dotterweich*, 200 N.Y. 299, 93 N.E. 985 (1911), all involved transactions where the promise was explicitly conditioned upon the performance of a condition precedent.

4. Exhibits 11, 31 and 58 are letters signed by each of the plaintiffs confirming the sales of KEC stock as of December 30, 1968 in the case of Gordon and Barnett and January 29, 1969 in the case of Hollender. All acknowledge satisfaction of KEC notes for previous loans, receipt of the purchase price and the agreement of the purchaser to pay stock transfer taxes. (Hollender however agreed to pay the stock transfer tax himself.) There is no condition or reservation in any document.

Cohen to be a "truthful and credible witness" and even absent the stipulation he "would have accepted Cohen's testimony as truthful." The court further found as a fact that all three plaintiffs had themselves initiated the sales of their stock which would indicate that they had not been victimized or gulled by a prior conspiracy among the defendants. Barnett had indicated a desire to sell in the summer of 1968; Gordon wished to sell because he was financially overextended, and Hollender because he "lost faith in management." All moreover were found by the court below to have been aware of Cohen's previous representation of Lerner. We cannot characterize these findings as clearly erroneous (Fed.R. Civ.P. 52(a)).

Appellants' only evidence of skulduggery is that Cohen, who purchased from Hollender, was a secret nominee of one Moscovitz who in turn was the nominee of Harry Saltzman. Hollender testified that he was not aware that Saltzman was to be the ultimate purchaser and had he known that fact he would not have sold. There is evidence that Saltzman had fired one David Haft, who was associated with him in producing a motion picture. Since Haft was a friend of Hollender's, Saltzman did not want to reveal himself as the purchaser of Hollender's shares. Hollender was disturbed by the firing of Haft and sought unsuccessfully to speak to Kirshner about the incident. He testified that he had lost confidence in KEC and on January 10, 1969 wrote a letter to Cohen asking him to make arrangements for his withdrawal as a stockholder "as soon as it is expe-

dient." There was further the testimony of Hollender that since Saltzman had previously indicated no interest in KEC, he would "have smelled a rat" if he knew Saltzman was now purchasing.

Appellants argue that the failure to disclose the identify of Saltzman as the purchaser constitutes the concealment of a material fact in connection with the sale of securities in violation of the common law fiduciary obligations of the defendants to their fellow stockholders in the close corporation, as well as a violation of Rule 10b–5. Our reading of the cases relied upon by the appellants, *Strong v. Repide*, 213 U.S. 419, 29 S.Ct. 521, 53 L.Ed. 853 (1909) and *Ward La France Truck Corp.*, 13 S.E.C. 373 (1943) does not support that proposition. Where there is a fiduciary relationship and the identity of the purchaser is material because the purchaser is aware of some fact which is unknown to the seller, then disclosure of his identify becomes necessary.[5]

Here, however, the court below found that the sole reason for concealing Saltzman's identity was Hollender's dislike for him rather than Saltzman's being privy to something unknown to Hollender which would enhance materially the value of the stock. Moreover, the complaint is bottomed upon the theory that the Lerner transaction was concealed from the plaintiffs. Since the court below found that there was not even a thought of this transaction until February 2, 1969, Saltzman could not possibly have had knowledge of it at the time of his purchase in January, 1969.

The judgment below is affirmed.

5. Thus, in *Strong v. Repide, supra*, the undisclosed purchaser was in fact the owner of three-quarters of the shares of the company and was its "administrator general," with broad powers of management. He had extensive knowledge of an impending sale of assets which he did not wish to be disclosed and which he was planning to complete. The concealment of his identity was characterized by the court as part of deceitful machinations to complete a sale without giving any information to the plaintiff stockholder. *Ward La France Truck Corp., supra*, involved the purchase of its own shares by a corporation through a dummy in order to conceal, inter alia, improved earnings and a prospective merger. *Helms v. Duckworth*, 101 U.S.App. D.C. 390, 249 F.2d 482 (1957), and *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545 (1928), also cited by appellants, are simply illustrative of the fiduciary relationship inherent in business associations similar to the one which previously existed among the parties in this case. That relationship is not in issue here. Had negotiations or plans to purchase been contemplated prior to the sale, the obligation to disclose would be apparent.